# In the United States Court of Federal Claims

No. 25-1608
Filed: July 28, 2026
Reissued: August 10, 2026†
***SEALED***

**AVKARE, LLC,**

***Plaintiff,***

**v.**

**THE UNITED STATES,**

***Defendant,***

**and**

**BRYANT RANCH PREPACK PHARMACEUTICALS,**

***Intervenor-Defendant.***

*Heather B. Mims* and *David R. Warner*, Warner PLLC, Reston, VA, for Plaintiff.

*Brendan D. Jordan*, Trial Attorney, *William J. Grimaldi*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brett A. Shumate*, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., with *Jason Fragoso*, Trial Attorney, and *Jean Athey*, Staff Attorney, Procurement Law Group, U.S. Department of Veterans Affairs, Office of General Counsel, for Defendant.

*Merle M. DeLancey, Jr.*, *Michael J. Slattery*, and *Shane M. Hannon*, BLANK ROME LLP, Washington, DC, for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

† This Opinion was originally issued under seal, (ECF No. 53), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on August 6, 2025. (ECF No. 55). The Court accepts all jointly proposed redactions and edits. The sealed and public versions of this Opinion differ only to the extent of those edits, the publication date, and this footnote.

Just as arthritis is driven by autoantibodies rather than joint pain, the law of substantial transformation targets the active agent, not the vessel carrying it. Plaintiff AvKare, LLC ("AvKare"), challenges the Department of Veterans Affairs' ("VA") award of a contract for a medication to treat rheumatoid arthritis, arguing that the agency misidentified the product's true country of origin and unlawfully accepted the awardee's proposal. (Compl., ECF No. 1; Am. Compl., ECF No. 38). But the Administrative Record, governing regulations, and case law collectively indicate that the VA reasonably centered its analysis on the origin of the active pharmaceutical ingredient ("API") and permissibly concluded, based on substantial evidence, that the awardee's tablets were compliant with international trade statutes. Because the agency's evaluation and award decision were neither arbitrary nor contrary to the solicitation or law, AvKare's Motion for Judgment on the Administrative Record, (Pl.'s Mot. J. Admin. R. ("Pl.'s MJAR"), ECF No. 39), is **DENIED**. Accordingly, the Court **GRANTS** the United States' and the awardee-Intervenor's Motions for Judgment on the Administrative Record, (Def.'s Cross-Mot. J. Admin. R. ("Def.'s xMJAR"), ECF No. 41; Int.-Def.'s Cross-Mot. J. Admin. R. ("Int.-Def.'s xMJAR"), ECF No. 40).

## I. Background

The VA sought a national requirements contract for the supply of Hydroxychloroquine tablets to VA and Department of Defense facilities. (Admin. R. ("AR __") at 33–37, 42–44, 47–48, 69, 89–90, 101, 103–04, 112–13, ECF No. 37). Hydroxychloroquine tablets are used to treat chronic rheumatoid arthritis. (AR 17). The solicitation required offerors to provide pricing for both 100-tablet and 500-tablet bottles for the base year and four option years. (AR 12, 34). The VA would make the award to the responsible offeror submitting the lowest-priced, technically acceptable proposal. (AR 103). Among the technical requirements, offerors were required to certify that each end product was made in the United States ("U.S.-made") or, as relevant to this case, a designated-country end product under the Trade Agreements Act ("TAA"). (AR 101). For offerors that were not the manufacturer ("distributor-offerors"), the solicitation also required a Letter of Commitment from the manufacturer confirming a sufficient and continuous source of supply. (AR 37). The solicitation defined "manufacturer" broadly to include entities engaged in the production, preparation, or processing of active and inactive ingredients into drug products, including the measuring, mixing, weighing, and compounding of those ingredients and the conversion of the product into various dosage forms. (*Id.*). Distributor-offerors were required to submit an acceptable Letter of Commitment to be eligible for award and to maintain the same manufacturer for the duration of the contract unless the contracting officer ("CO") approved a change. (*Id.*).

The Letter of Commitment requirement was not relevant to AvKare, whose products were domestically manufactured. (AR 139). Bryant Ranch Prepack ("Bryant Ranch") submitted a proposal including a Letter of Commitment from its supplier stating that its Hydroxychloroquine tablets were TAA-compliant because the API originated in Taiwan, a designated country, and the tableting performed in India, a non-designated country, did not amount to substantial transformation. (AR 309).

After securing the licenses needed to manufacture Hydroxychloroquine tablets in the United States, AvKare submitted its proposal offering unit prices of $[redacted] for the 100-tablet bottle and $[redacted] for the 500-tablet bottle**.** (AR 122–221). On July 15, 2025, the VA notified

AvKare that it had not been selected for award. (AR 567). Instead, the VA chose Bryant Ranch, whose proposal offered lower prices—$10.17 for the 100-tablet bottle and $48.39 for the 500-tablet bottle. (AR 464). Considering the entire solicitation, this totaled a $[redacted] difference for the base year and a difference of $[redacted] over the possible life of the contract:

| Offeror | Product Origin | Base Year Estimated Value | Base Year + 4 Options Estimated Value |
|---|---|---|---|
| *Bryant Ranch* | Taiwan | $2,912,753.82 | $14,563,769.10 |
| *AvKare* | U.S.-made | $[redacted] | $[redacted] |

(*See id.*). The VA found Bryant Ranch's pricing fair and reasonable under the relevant provision of the FAR.[1] (AR 465). Importantly, the VA concluded that Bryant Ranch's proposed products met all solicitation requirements, including the requirement that the tablets be U.S. or designated-country-end-made. (AR 466–67).

AvKare immediately challenged the award at the agency level with the Executive Director of the VA's Office of Acquisition and Logistics; therein, AvKare asserted that Bryant Ranch's tablets were actually manufactured in India and therefore violated the TAA. (AR 564–72). The CO denied AvKare's protest, concluding that the tablets were "neither wholly the growth, product, or manufacture of India, nor substantially transformed in India," and that the API originated in Taiwan—a World Trade Organization Government Procurement Agreement country. (AR 612–15). On that basis, the CO determined that the tablets complied with the TAA. (AR 614). AvKare filed this suit on September 26, 2025, alleging that the VA's evaluation, its TAA analysis, and its award decision were arbitrary, unreasonable, and contrary to the solicitation. (*See* Compl.).

After AvKare filed its initial Motion for Judgment on the Administrative Record, (ECF No. 26), the United States sought an unopposed voluntary remand, explaining that the VA wished to reconsider its evaluation and award determination, (ECF No. 28). The Court granted a sixty-day remand. (ECF Nos. 30, 31). During that period, the VA reopened targeted, limited discussions with AvKare and Bryant Ranch. (AR 618, 620). It asked AvKare to confirm that its proposed products were U.S.-made and to extend its offer. (AR 618). For Bryant Ranch, the VA requested an extension and additional information supporting its TAA certification. (AR 620). The VA specifically sought evidence regarding the manufacturing of the API, the final dosage-form manufacturing process, and the locations where substantial transformation did or did not occur. (*Id.*).

---

[1] In reaching that conclusion, the CO used three price-analysis techniques authorized by FAR 15.404-1(b)(2): comparing offerors' proposed prices, reviewing published price lists and market data (including Federal Supply Schedule and open-market pricing), and evaluating Bryant Ranch's prices against the Independent Government Cost Estimate and historical prices. (AR 465–66).

Bryant Ranch responded with documentation purporting to show that the API was manufactured in the TAA-designated country of Taiwan and that subsequent processing steps did not alter the drug's chemical structure. (AR 624–28). Bryant Ranch explained that its Hydroxychloroquine tablets are produced by two entities: [redacted] in Taiwan and [redacted] in India. (AR 624–27). To substantiate its account, Bryant Ranch provided declarations from [redacted]'s Quality Assurance Manager, and [redacted]'s Chief Financial Officer, along with a Certificate of Analysis supplementing the Certificate of Origin previously submitted to the VA. (AR 630, 632–33, 635–38). In its response, Bryant Ranch went on to describe the manufacturing steps performed by [redacted] in Taoyuan City, Taiwan, where constituent chemicals are processed into Hydroxychloroquine Sulfate USP, a new chemical moiety with its own molecular structure, pharmacological activity, and therapeutic purpose. (*See* AR 624–25). Bryant Ranch further informed the VA that once [redacted]'s Hydroxychloroquine Sulfate USP arrives in India, [redacted] performs only routine dosage-form processes—measuring, mixing, granulating, and tableting—that do not alter the API's molecular structure or pharmacological activity. (AR 625).

In evaluating Bryant Ranch's submission, the VA conducted independent research, including reviewing information from Dailymed.gov and Customs and Border Protection ("CBP") administrative decisions addressing country-of-origin determinations for pharmaceutical products manufactured across multiple countries.[2] (*See* AR 656–57). Based on Bryant Ranch's submissions and the VA's own research, the VA determined that the "essential character" and therapeutic identity of Bryant Ranch's Hydroxychloroquine Sulfate are created in Taiwan, and consequently substantial transformation occurs there. (AR 657). Because the molecular structure and pharmacological activity of the finished dosage form produced in India are identical to those created by [redacted] in Taiwan, the VA concluded that no substantial transformation occurs in India. (*Id.*). Accordingly, the VA determined that Bryant Ranch "provided sufficient evidence to support their claim that their proposed products are designated country end products in accordance with the TAA/FAR Part 25." (AR 659). The VA therefore selected Bryant Ranch for award as "the lowest-priced, technically acceptable proposal." (*Id.*; Notice of Decision on Remand at 15, ECF No. 35-1).

Once the award decision was affirmed, AvKare maintained that the remand decision did not resolve its grounds for protest and subsequently filed its Amended Complaint alleging three counts. (Am. Compl.). First, AvKare contends that the VA's TAA analysis was arbitrary and

---

[2] CBP determines a "country of origin" when administering customs statutes governing imported merchandise, including tariff classification, duty assessment, and origin-marking requirements. *See* 19 U.S.C. § 1304 (requiring imported articles to be marked with their country of origin); *see also* 19 C.F.R. Part 134 (CBP regulations implementing origin-marking requirements). CBP also applies rules of origin to determine eligibility for preferential tariff treatment under various trade agreements and to enforce non-preferential origin rules for imported goods. *See* 19 C.F.R. Part 102. These determinations arise in the import context and do not bind contracting agencies applying the TAA in procurement. *Acetris Health, LLC v. United States*, 949 F.3d 719, 728–30 (Fed. Cir. 2020).

unreasonable because Bryant Ranch's tablets were manufactured in India, a non-designated country. (*Id*. at 9–12). Within that argument, AvKare maintains that the VA improperly focused on the origin of the API rather than the origin of the finished product and relied on Bryant Ranch's representations and CBP rulings instead of conducting its own analysis. (*Id.* at 10–11). Second, AvKare alleges that the VA's evaluation of Bryant Ranch's proposal was arbitrary and unreasonable because Bryant Ranch's tablets were not TAA-compliant and therefore should have been rejected. (*Id.* at 12). AvKare claims that this error deprived it of a substantial chance of award. (*Id.*). Third, AvKare argues that the award decision violated the solicitation's terms, which required award to the lowest-priced, *technically acceptable* offeror. (*Id.* at 13). Because Bryant Ranch's product was, in AvKare's view, not technically acceptable, AvKare contends that the VA lacked authority to award the contract to Bryant Ranch and that AvKare was the true lowest-priced, technically acceptable offeror. (*Id.*).

## II. Analysis

The parties move for judgment on the administrative record. (Pl.'s MJAR; Def.'s xMJAR; Int.-Def.'s xMJAR). The single dispositive question is whether the VA reasonably concluded that Bryant Ranch's product was technically acceptable despite the TAA's prohibition on end products manufactured in India. For the reasons explained below, the Court finds the VA's determination reasonable and supported by substantial evidence.

Under the Tucker Act, an interested party may challenge "a solicitation by a Federal agency for bids or proposals," "a proposed award," "the award of a contract," or "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 n.18 (2021). Section 1491(b)(4) incorporates the Administrative Procedure Act's ("APA") standard of review, under which the Court asks whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and, if so, whether the error was prejudicial. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); 5 U.S.C. § 706.

Accordingly, APA review proceeds along two familiar tracks: (1) whether the agency lacked a rational basis or acted arbitrarily and capriciously, and/or (2) whether the agency violated a statute or regulation in the procurement process. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). The agency's authority is not carte blanche; its decisions must rest on a "rational connection between the facts found and the choice made," as the APA requires. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). However, the Court may not substitute its judgment for that of the agency and its review is highly deferential. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974); *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). That deference is especially strong in negotiated procurements, where contracting officers exercise "a relatively high degree of discretion." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). The Court also applies a presumption of regularity to agency procurement decisions. *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). If the record reveals a reasonable basis for the agency's action, the Court "should stay its hand," even if it might have reached a different conclusion in the first instance. *Honeywell, Inc.*

*v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971); *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010)).

The TAA provides that the Government may acquire only "U.S.-made or designated country end products." FAR 52.225-5. An "end product" is defined as "those articles, materials and supplies to be acquired for public use." FAR 25.003. The TAA defines when an article is a "product of" a country:

> An article is a product of a country or instrumentality only if (i) it is wholly the growth, product, or manufacture of that country or instrumentality, or (ii) in the case of an article which consists in whole or in part of materials from another country or instrumentality, it has been *substantially transformed* into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

19 U.S.C. § 2518(4)(B) (emphasis added).

The key issue here—where Bryant Ranch's product was "substantially transformed" for TAA purposes—is a mixed question of law and fact, though primarily factual.[3] *TR Int'l Trading Co. v. United States,* 433 F. Supp. 3d 1329, 1341 (Ct. Int'l Trade 2020) (applying the substantial-transformation test to a particular set of manufacturing steps constitutes a mixed question of law and fact), *aff'd,* 4 F.4th 1363 (Fed. Cir. 2021). To determine where substantial transformation occurs, courts and agencies apply the established legal standard: a product is substantially transformed when manufacturing or processing causes it to "lose its identity" and become a "new product having a new name, character, and use." *Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018) (cleaned up). Substantial transformation may also occur when distinct parts are combined to form a new commercial item. *Wabtec Corp. v. United States*, 815 F. Supp. 3d 1390, 1415 (Ct. Int'l Trade 2025) (quoting *Uniden Am. Corp. v. United States*, 120 F. Supp. 2d 1091, 1095 (Ct. Int'l Trade 2000)). Agencies evaluate substantial transformation by considering factors such as: "(1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end use; (4) the cost of production/value added; and (5) level of investment." *Bell Supply*, 888 F.3d at 1228–29. Therefore, although the legal standard is fixed, applying it requires an inherently fact-intensive inquiry, assessing the nature, complexity, and effect of the specific manufacturing steps. It follows that, while substantial transformation is a mixed question, the Court's review focuses on whether the VA's

---

[3] This understanding accords with precedent treating such determinations as involving both factual evaluation and legal application, and with the Supreme Court's broader description of what occurs when a legal standard is applied to a defined set of facts. *United States v. Gaudin*, 515 U.S. 506, 512 (1995); *Campbell v. Merit Sys. Protection Bd.*, 27 F.3d 1560, 1565 (Fed. Cir. 1994); *CPC Int'l, Inc. v. United States*, 20 C.I.T. 806, 808 n.3 (1996).

factual findings are supported by the record and whether its application of the standard was reasonable.

As AvKare characterizes it, the Federal Circuit's decision in *Acetris Health, LLC v. United States*, illuminates the basic framework for determining the country of origin of pharmaceutical end products. (Pl.'s MJAR at 1, 12–16 (citing 949 F.3d 719 (Fed. Cir. 2020))). In *Acetris*, the VA confronted a similar question: whether tablets manufactured in the United States using an API sourced from India qualified as "U.S.-made end products." *Acetris Health*, 949 F.3d at 724. Prior to the procurement, Acetris sought a country-of-origin determination from CBP, which concluded that the tablets were products of India because the API originated there. *Id*. When the VA issued a solicitation containing FAR 52.225-5 and FAR 52.225-6, Acetris attempted to clarify that its tablets should be treated as U.S.-made end products because the final manufacturing occurred in New Jersey. *Id*. The VA rejected that position, adopted CBP's determination wholesale, and excluded Acetris's proposal as offering a product from a non-designated country. *Id.* at 726.

Acetris protested; the Court of Federal Claims held that the VA misinterpreted both the TAA and the FAR, concluding that the tablets were manufactured in the United States and that the VA's reliance on CBP's determination was improper. *Acetris Health, LLC v. United States*, 138 Fed. Cl. 579, 602 (2018). On appeal, the Federal Circuit affirmed that portion of the decision, later refining the form of declaratory relief. *Acetris Health*, 949 F.3d at 731–33. The Federal Circuit's reasoning is central: contracting agencies must independently determine whether an offered product qualifies as a U.S.-made end product; CBP's origin determinations are not binding in procurement. *Id.* at 727–30. The TAA's country-of-origin inquiry focuses on the origin of the final product—not the origin of its components. *Id.* at 731. A product is a "product of" a country only if it is wholly manufactured there or substantially transformed there into a new and different article of commerce. *Id*. at 732. Because the FAR's definition of "U.S.-made end product" does not require substantial transformation, a product may be U.S.-made even if its components are foreign, so long as the manufacturing occurs domestically. *Id*. at 729–30.

Although the Circuit affirmed the trial court's decision, it remanded to clarify two points: (1) a pharmaceutical product using foreign API does not automatically become the product of that foreign country, and (2) a product manufactured in the United States using foreign API may qualify as a U.S.-made end product under the FAR. *Id*. at 731–32. Important to this case, *Acetris* left unresolved the depth of analysis COs must undertake when evaluating manufacturing processes or determining substantial transformation, and it did not address how substantial transformation should be determined in more complex pharmaceutical supply chains. In fact, some protestors continue to treat API origin as dispositive for TAA compliance, except in the narrow context of determining whether a product is U.S.-made under *Acetris*'s framework. *See Cosette Pharms., Inc. v. United States*, 179 Fed. Cl. 740, 746 n.2 (2025) (illustrating that some protestors continue to rely on API-origin theories, noting that API manufacture has "historically" been treated as the last substantial transformation, though final manufacture "may also be relevant").

AvKare's protest requires the Court to determine whether the VA reasonably concluded that Bryant Ranch's Hydroxychloroquine tablets were technically acceptable under the TAA. Applying the highly deferential APA standard, and the substantial-transformation framework, the Court concludes that the VA's determination was rational, supported by the record, and within the bounds of lawful procurement decision-making. The statutory country-of-origin test is central to the dispute. Notably, the FAR does not incorporate the TAA's country-of-origin test for determining whether a product is "U.S.-made," as was at issue in *Acetris.* FAR 25.003; *Acetris Health*, 949 F.3d at 729–30. That distinction is critical, as this case concerns whether Bryant Ranch's tablets are a designated-country end product, not whether they are "U.S.-made." Thus, the TAA's statutory rule-of-origin test applies directly, and the VA was required to determine where substantial transformation occurred.

The Administrative Record demonstrates that the VA did not simply accept Bryant Ranch's representations or defer to CBP. Rather, consistent with *Acetris*'s requirement that contracting agencies make their own country of origin determinations, the agency reopened discussions, sought detailed information from both offerors, and required Bryant Ranch to substantiate its TAA certification with evidence regarding: (1) the synthesis of the API; (2) the dosage form manufacturing steps; and (3) the locations where substantial transformation did or did not occur. (AR 620). Bryant Ranch responded with extensive documentation, including sworn declarations from [redacted]'s Quality Assurance Manager and [redacted]'s Chief Financial Officer, a Certificate of Analysis, and a step-by-step description of the chemical synthesis performed in Taiwan. (AR 624–38). This evidence provided the VA with a factual basis to evaluate where the product's "name, character, and use" were imparted, enabling the agency to conduct the requisite, independent substantial transformation analysis. The VA reviewed these materials and conducted its own research using Dailymed.gov and CBP administrative decisions addressing country-of-origin determinations for multi-country pharmaceutical manufacturing. (AR 656–58). The VA rationally found that [redacted]'s multistep chemical synthesis in Taoyuan City, Taiwan transformed constituent chemicals into Hydroxychloroquine Sulfate USP—a new chemical moiety with its own molecular structure, pharmacological activity, and therapeutic purpose. (AR 657, 624–27). Under *Bell Supply*, a product is substantially transformed when it "loses its identity" and becomes a "new product having a new name, character and use." 888 F.3d at 1228. The VA reasonably concluded that [redacted]'s synthesis imparted the drug's essential "name, character, and use," satisfying the statutory substantial-transformation standard. The VA further found that [redacted]'s operations in India consisted only of routine dosage-form processes—standard tableting steps that do not alter the API's chemical structure or therapeutic function. (AR 625, 657).

A similar principle from *Meyer Corp., U.S. v. United States* reinforces the VA's determination. 43 F.4th 1325 (Fed. Cir. 2022). There, the Federal Circuit held that substantial transformation does not occur when the intermediate article already possesses its essential character and predetermined use, and the remaining steps merely finish it into its final form. *Id.* at 1331. The Court explained that the relevant inquiry is whether the intermediate product is useful only for producing a specific finished item—not whether it is itself usable by consumers. *Id.* (citations omitted). Routine finishing operations, even those that change the article's appearance or add components, do not amount to substantial transformation when they do not alter the article's fundamental name, character, or use. *Id.* at 1331–32. That is precisely the

situation here: the API's identity, character, and predetermined therapeutic use were fixed in Taiwan, and India's finishing steps did not alter them. [redacted]'s multistep chemical synthesis in Taiwan created the active pharmaceutical ingredient with its own molecular structure, pharmacological activity, and therapeutic purpose. (AR 624–25). By contrast, [redacted]'s tableting operations in India merely converted that already-active API into a dosage form, without changing its molecular identity or therapeutic function. (AR 625). As in *Meyer Corp.*, those finishing steps did not alter the API's identity or predetermined therapeutic use. They were routine formulation processes, not transformative manufacturing.

AvKare identifies no evidence showing that the Indian processing changed the API's identity in a manner satisfying the statutory test. It does not dispute that the molecular structure and therapeutic function remain unchanged. Instead, it argues that converting API into a finished tablet necessarily creates a new article of commerce. (Pl.'s MJAR at 18). That argument conflates routine dosage-form finishing with substantial transformation and overlooks that the statutory inquiry turns on whether the product's "name, character, or use" has been altered. That position is inconsistent with longstanding CBP precedent and with the Federal Circuit's recognition that substantial transformation is a fact-specific, manufacturing-specific inquiry. *Acetris Health*, 949 F.3d at 728–29.

AvKare's broader argument that the site of tableting must always control would collapse the TAA's two-prong test and contradict *Acetris*'s instruction that agencies must evaluate where the last substantial transformation actually occurs. It would also create an unintended loophole where companies could perform minimal, non-transformative tableting in a designated country to claim compliance despite all meaningful manufacturing occurring elsewhere. Nothing in the statute, regulations, or case law compels such a result, and the TAA's substantial-transformation framework forecloses it.

The record further fails to indicate that the VA improperly deferred to CBP. Instead, the VA conducted its own independent analysis, reviewed Bryant Ranch's submissions, and applied the statutory "name, character, or use" test when determining the site of substantial transformation. (AR 656). The VA's reliance on publicly available labeling identifying Taiwan as the product's origin was corroborative, not dispositive. (*See* AR 656–57). In making its award decision, it is entirely reasonable for a CO to account for another agency's position or interpretation when that agency has specialized oversight and expertise in a given area. *See Honeywell, Inc.*, 870 F.2d at 648 (quoting *John Reiner & Co. v. United States*, 163 Ct. Cl. 381, 390 (1963)). While CBP's rulings are not binding, *Acetris* recognizes that they remain persuasive authority. 949 F.3d at 728. Here, the Administrative Record makes clear that the CO noted CBP's repeated finding that converting bulk API into tablets does not constitute substantial transformation. (AR 657–58 (citing HQ 561975 (April 3, 2002); HQ 561544 (May 1, 2000); HQ 735146 (November 15, 1993))). Considering the record as a whole, this evidence supported the VA's determination that the "essential character" of Bryant Ranch's Hydroxychloroquine Sulfate was created in Taiwan, and that the subsequent tableting in India did not effect a second substantial transformation. (AR 657). The VA therefore reasonably determined that the tablets were products of a TAA-designated country and thus technically acceptable. (AR 659).

AvKare's position is not unreasonable in the wake of *Acetris*, which left certain contours of the substantial-transformation analysis open. However, the Court may not substitute its judgment for that of the agency when its decision is rationally documented. *Bowman Transp.*, 419 U.S. at 285. Critically, as this Court has recently noted, the arbitrary-and-capricious standard applied to APA review "lives a double life; it necessarily allows for divergent but reasonable outcomes. The question is not whether another decision might also have been reasonable, but whether the one reached is within the bounds of rational decision making." *Hiatt v. Sec'y of Health & Hum. Servs.*, 180 Fed. Cl. 449, 459 (2026). Thus, even if the VA could have reached a different conclusion on this record, that possibility does not render the decision it did reach arbitrary, so long as the agency considered the relevant evidence and applied the governing legal standards.

Here, the VA considered the relevant factors, applied the correct legal framework, and reached a conclusion supported by substantial evidence. Bryant Ranch's proposal was the lowest-priced, technically acceptable offer. The VA's award decision was therefore consistent with both the solicitation and the TAA. AvKare's disagreement with the agency's technical judgment—without more—does not provide a basis for judicial intervention under the APA's deferential standard.

## III. Conclusion

This dispute turns on the same distinction that frames the Court's opening metaphor: the difference between what is most visible and what is most consequential. AvKare focuses on the finished tablet, but the VA's inquiry properly centered on the origin of the active substance that imparts the product's therapeutic identity. The VA applied the TAA's framework faithfully, reasonably concluded that Bryant Ranch's tablets derive from a designated-country ingredient, and made an award consistent with both the solicitation and governing law. Because the VA reasonably traced the product's country of origin to the location of its last substantial transformation, the Court upholds its determination. The United States' and Bryant Ranch's Motions for Judgment on the Administrative Record, (Def.'s xMJAR; Int.-Def.'s xMJAR), are **GRANTED** and AvKare's Motion for Judgment on the Administrative Record, (Pl.'s MJAR), is **DENIED**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **fourteen (14) days** of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge